(155 App. Div. 156.)

GRABFIELD v. HARALSON COUNTY BANK OF BUCHANAN, GA.

(Supreme Court, Appellate Division, First Department. February 7, 1913.)

PRINCIPAL AND AGENT (§ 166*)—UNAUTHORIZED ACTS—RATIFICATION.

      M. & Co. authorized its salesman to collect for his sales either in cash or checks, to indorse the checks in its name "for exchange only," and to obtain in exchange therefor cashiers' checks or other exchange for remittance to it. The salesman opened an account in his own name in

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

defendant bank, deposited the checks, indorsed in his own name and the name of M. & Co., and obtained cashiers' checks or other exchange for remittance, principally from other banks. Some time before his receipt of checks for which he failed to account, an auditor was sent over his route to visit the customers and check up payments and checks. *Held*, that M. & Co. was charged with notice that he was not following his instructions, since the auditor must have learned that the cashiers' checks for remittances were not issued by the banks which cashed the customers' checks, and, moreover, the company must have expected the salesman to open an account, as it could hardly have expected a bank with which he had no account to issue cashiers' checks for the full amount of the customers' checks, and hence could not recover from defendant the amount of the checks cashed by it and not accounted for by the salesman.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 627–633; Dec. Dig. § 166.*]

Appeal from Trial Term, New York County.

Action by Joseph P. Grabfield against the Haralson County Bank of Buchanan, Ga. From a judgment for plaintiff on a directed verdict, defendant appeals. Reversed, and complaint dismissed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, SCOTT, and DOWLING, JJ.

G. H. Payne, of Medina, for appellant.

George W. Morgan, of New York City (Henry H. Abbott and Edward A. Craighill, Jr., both of New York City, on the brief), for respondent.

LAUGHLIN, J. This is an action on an assigned claim of Morris & Co., a Maine corporation, which was engaged in the business of packing meat and of refining lard and oil, having an office at East St. Louis, Ill., to recover the sum of $3,428 for moneys alleged to have been had and received by the defendant to the use of Morris & Co., being the proceeds of checks made by customers of Morris & Co. to the order of the corporation and indorsed by one Wills, its sales agent, and deposited to the credit of his individual account with the defendant, and subsequently checked out and appropriated by him to his own use.

Wills was employed by Morris & Co. in the summer of 1907, and after working at a plant for about a month to learn the business, he was sent out as a salesman to represent it in selling its products and collecting therefor on a car route between Cedartown and Griffin, Ga. He was expressly authorized to collect for his sales, either in cash or by obtaining checks on local banks to the order of his employer, in which case he was instructed to indorse the name of the payee on such checks "for exchange only," and to obtain in exchange therefor cashiers' checks or bank drafts or other exchange, and remit such exchange, instead of the checks of customers, to Morris & Co. It appears by the testimony of the credit manager of Morris & Co. that these were the general instructions which he was authorized to give and did give to all salesmen, including Wills, and that the salesmen were under his charge and control with respect to collections and financial transactions with the company.

Wills took up his residence at Buchanan, Ga., and on the 7th day of October, 1907, called upon the cashier of the Buchanan Banking Company, of which the defendant is the successor, at that place, and stated that he desired to open a small account, which was assented to, and he opened an account in his own name with a deposit of $10 in cash, supposed to be his personal funds. At the same time, or thereafter, but on or before the 14th of the same month, he informed the cashier that he represented Morris & Co. in selling its products and collecting therefor, and that his instructions were not to remit the checks received from customers, but to indorse them and to remit the proceeds, which he stated he would do by procuring cashiers' checks or drafts "principally from the Bank of Senoia." He stated, evidently as a reason for not opening a bank account at Senoia, that the Bank of Senoia or banks of Senoia would not collect the checks of customers of Morris & Co., without charging exchange; whereas he understood, and apparently correctly, that the bank at Buchanan would collect such checks without making any charge. He also stated to the cashier that it was more convenient for him to obtain cashiers' checks or New York exchange or drafts at Senoia than at Buchanan, for the reason that his business called him there at the particular weekly period when he was required to make remittances to his employer.

It also appears by the testimony of the cashier that it developed in a discussion between him and Wills that cashiers' checks or exchange would be procured at the Bank of Senoia cheaper than the defendant or its predecessor would issue them. Thereupon, without further information with respect to Wills' authority, the cashier permitted Wills to indorse and deposit to the credit of his individual account checks made by the customers of Morris & Co. to its order. The first of such checks was deposited in said account on the 14th day of October. Wills continued to represent Morris & Co. in this territory, obtaining and forwarding orders and receiving weekly statements from his employer with respect to invoices of goods shipped to customers and the amounts to be collected therefor, and collecting, principally by checks to the order of Morris & Co., which he indorsed and deposited to the credit of his account with the defendant or its predecessor, until August, 1910, or for a period of nearly three years, during which time it is evident that there were a very great number of such transactions, for this action relates to 76 checks which were received and unaccounted for by Wills within a period of less than two months.

It appears that during this time, with the exception of the checks involved in this action, which were drawn by customers between the 18th day of July, 1910, and the 6th day of August, 1910, Wills remitted to his employer regularly the amounts he collected from customers, and he did this principally through the Bank of Senoia, but at times through other banks along his route, by obtaining cashiers' checks or New York exchange purchased by his individual checks drawn on this account.

It appears by the testimony of the cashier of the defendant and its predecessor that in a few instances Wills, prior to the time his employer suspected that he was not remitting the full amount collected,

obtained cashiers' checks to the order of Morris & Co. from the defendant; but that is controverted. It also appears that during this time Wills was engaged in the hotel and poultry business and as a preacher at Buchanan, to the knowledge of the officers of the defendant. In addition to the checks of Morris & Co. which were deposited to Wills' credit in this account, items of cash and checks payable to his individual order were also similarly deposited; but the amount thereof was not shown.

The position taken by the defendant is that, having received no notice from Morris & Co. that Wills was not authorized to indorse the checks and to deposit and draw out the proceeds as he did, it assumed that he was acting within his authority, and it relied upon the acquiescence of his employer. On the other hand, it is contended on behalf of the plaintiff that Morris & Co. assumed that Wills was indorsing the checks as directed and that he was receiving in exchange for the checks so indorsed cashiers' checks or New York exchange and remitting the same to it. It appears, however, that Morris & Co. did not rely implicitly upon the integrity of Wills, for in the year 1909 it sent an auditor over his route to "visit the customers and check up the payments and checks, to see that everything was being handled in the proper way"; and such auditor made a "general audit" of Wills' accounts and reported everything "all right." Morris & Co. was, we think, chargeable with notice of the fact that Wills did not follow its directions in indorsing the checks "for exchange only"; for it may fairly be inferred that the checks of the customers thus examined by the auditor showed that they were not cashed by the banks which issued the cashiers' checks, which during this long period Wills forwarded to Morris & Co.

There is evidence indirectly tending to show that Morris & Co. did not know that Wills was depositing the checks in his individual account until it was reported by another auditor, who was sent out by the credit manager on the 6th of August, 1910, or discovered by the credit manager himself shortly after the date last mentioned; but it was not shown that the auditor who went over the route in 1909 did not discover the fact, and it is a reasonable inference that he did, for it is probable that the customers' checks which the auditor examined showed that they had been collected by the defendant, and Morris & Co. knew that few, if any, of the cashiers' checks were issued by defendant. Moreover, it is a reasonable inference that it was expected that Wills would open a bank account, for it was not expected that he should personally go to each bank upon which a customer's check was drawn and collect it, or surrender it, and obtain exchange therefor to remit to his employer. It was expected that he should make remittances at weekly intervals; and it could not reasonably have been expected that he could call at any bank wherever he happened to be at the time he was required to make remittances, and, without opening an account against which dishonored checks might be charged up, obtain cashiers' checks or drafts for the full amount of the checks of customers, which he was to indorse and deliver to the bank issuing the cashiers' check or draft. That would be equivalent

to cashing the checks at their face value; the bank not only taking the risk of collection, but losing the use of its money in the meantime. Of course, in the event of noncollection, recourse could be had to the liability of Morris & Co. as indorser; but it cannot be assumed that banks would do business in that manner.

As already observed, it appears that Wills was authorized to collect cash from the customers, and that he was fully authorized to indorse the checks of the customers in such manner as would enable the transferee to collect them without further indorsement on behalf of the payee. It is unnecessary to consider the legal effect of the attempt to limit Wills' authority by instructions that, when he received a check from a customer to the order of his employer, in indorsing the name of the payee he was required to add the words "for exchange only," because, as already appears, Morris & Co. was chargeable, long before the checks in question were credited to Wills' account, with knowledge that he had not understood, or had not acted upon, his instructions, and that he was merely indorsing the checks of customers in the name of his firm and in his own name.

We are of opinion, also, that Morris & Co. during this long course of business was chargeable with knowledge of the manner in which its agent was conducting its business, and that it is now too late for it to contend that he exceeded his authority on depositing these checks to the credit of his individual account. As we view the evidence, therefore, the court erred in directing a verdict for the plaintiff, and, the material facts being uncontroverted, the defendant's motion for the dismissal of the complaint should have been granted.

It follows that the judgment should be reversed, with costs to appellant, and the complaint dismissed, with costs. All concur.